AUSA: Connie L. Dang

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 2 5 MAG 3 6 5 4

UNITED STATES OF AMERICA

v.

QUIRINO GARCIA DIAZ,

Defendant.

**COMPLAINT**

Violations of 21 U.S.C. § 846

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

ALEX JOHNSON, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

## COUNT ONE
### (Conspiracy to Distribute Narcotics)

1.      From at least in or about August 2024 through at least in or about October 2025, in the Southern District of New York and elsewhere, QUIRINO GARCIA DIAZ, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the controlled-substance laws of the United States.

2.      It was a part and object of the conspiracy that QUIRINO GARCIA DIAZ, the defendant, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3.      The controlled substances involved in the offense were (i) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A), (ii) five kilograms and more of mixtures and substances containing a detectible amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A), (iii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Section 841(b)(1)(A); and (iv) mixtures and substances containing a detectible amount of procaine, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.      I am a Special Agent with the DEA, and I have been a Special Agent with the DEA for approximately 3.5 years. I have been personally involved in this investigation. This affidavit is based on my involvement in this investigation, my conversations with other law enforcement officers and other individuals, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all

the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      From my personal observations, my conversations with other law enforcement officers, and my review of law enforcement reports and records, I have learned the following:

a.      On or about August 13, 2024, an undercover law enforcement officer ("UC-1") entered Aseel Grocery Store in Manhattan (the "Store"), which was believed to be selling cutting agents—*i.e.*, substances added to narcotics to enhance their effects and/or increase their volume (and thus their saleable quantity). The Store has a physical storefront in the Inwood neighborhood of Manhattan and according to the Store's signage, the Store purports to sell convenience items, including coffee, beer, cigars, candy, and hookah items. Below is a photograph of the Store's exterior:



b.      After UC-1 entered the Store, UC-1 spoke to an individual later identified to be QUIRINO GARCIA DIAZ, the defendant, and asked about purchasing cutting agents. GARCIA DIAZ then made a phone call, after which another individual later identified to be MUJAHED ALI, charged by complaint in *United States v. Ali*, 25 Mag. 3625 (S.D.N.Y.),[1] entered the Store and asked UC-1, in sum and substance, what UC-1 planned to cut. UC-1 responded, in sum and substance, that he intended to cut "coke," which, based on my training and experience, I understand to be a common slang term for cocaine. In response, ALI suggested, in sum and substance, that UC-1 use fish scale because it would make UC-1's product "shine the most." Based on my training experience, I know fish scale to be a common cutting agent for narcotics. ALI then told GARCIA DIAZ to retrieve what GARCIA DIAZ understood to be cutting agents; and law

---

[1] In the complaint against ALI in *United States v. Ali*, 25 Mag. 3625 (S.D.N.Y.), GARCIA DIAZ is identified as "CC-1."

enforcement officers observed GARCIA DIAZ exit the Store, walk down the street from the Store to a shed (the "Shed"), enter the Shed, and then exit the Shed with a weighted black plastic bag. GARCIA DIAZ then re-entered the Store with the bag from the Shed. Below is a photograph depicting the Shed, located down the street from the Store:



c.      Once inside the Store, GARCIA DIAZ handed ALI the bag, and ALI showed UC-1 the contents of the bag and engaged in conversation with UC-1 about the price of cutting agents. UC-1 left the Store without making any purchases.

6.      Based on my personal observations, my conversations with other law enforcement officers, and my review of audio and video recordings made by UC-1, I also learned the following:

a.      On or about September 5, 2024, November 14, 2024, January 21, 2025, and February 12, 2025, UC-1 again visited the Store to purchase cutting agents for narcotics; and on or about July 22, 2025, a confidential source ("CS-1")[2] visited the Store to buy cutting agents for narcotics. The activity that followed during each of these visits fit a similar pattern as the activity that took place on or about August 13, 2024, as described above: During each of these visits, after UC-1 or CS-1 indicated to a Store employee that UC-1 or CS-1 wanted to buy cutting agents, a Store employee exited the Store, walked to the Shed and retrieved a weighted black plastic bag from the Shed, and returned to the Store to give UC-1 or CS-1 the weighted black plastic bag. On certain of these visits to the Store, UC-1 indicated that he was buying the cutting agents to mix with narcotics. Specifically:

---

[2] CS-1 has been a DEA confidential source since in or about 2021 and provided the information in this warrant while working as a confidential source. CS-1 works as a confidential source in exchange for financial compensation and immigration benefits. CS-1 was arrested in or about March 2013 for a firearms offense and in or about September 2013 for robbery. Information provided by CS-1 has been corroborated and proven truthful and reliable.

      i.      On or about September 5, 2024, UC-1 entered the Store and spoke to MUJAHED ALI and another Store employee ("CC-2")[3] which was captured in an audio recording created by UC-1. UC-1 stated, in sum and substance, that UC-1 had been in the Store a few weeks prior and that Store employees had shown fish scale to UC-1. UC-1 then stated, in sum and substance, that he needed to buy a certain quantity of fish scale because UC-1 needed it for "five or six to mix." Based on my training and experience and my participation in this investigation (including my knowledge of the quantity of fish scale sold in this transaction and future conversations involving Store employees, as described below), I understand "five or six to mix" to refer to purchasing enough cutting agents to mix with five or six kilograms of narcotics such as cocaine. UC-1 asked, in sum and substance, how many grams come in a bag of the fish scales, to which ALI replied that each bag contains 1,000 grams. After negotiating the price of the fish scale, CC-2 agreed to sell UC-1 three bags of fish scale (or three kilograms) for $420. CC-2 then exited the Store, and law enforcement officers observed him enter the Shed, exit the Shed carrying a weighted black plastic bag, and re-enter the Store with the bag. CC-2 handed UC-1 the bag and inside the bag, UC-1 observed three clear plastic bags with shiny, white, powdery substances. UC-1 handed CC-2 $420 in cash and then left the Store with the bag. Inside the weighted black plastic bag, law enforcement found several plastic bags containing a white powdery substance, which are pictured below:



      ii.      On or about November 14, 2024, UC-1 entered the Store and spoke to QUIRINO GARCIA DIAZ, the defendant, and CC-2, which was captured in an audio and video recording created by UC-1.[4] UC-1 indicated, in sum and substance, that he had previously purchased "three" fish scale from the Store for "six kilos" previously, which, based on my training and experience and my participation in this investigation, I know refers to the purchase of three kilograms of fish scale for six kilograms of narcotics, including cocaine. UC-1 then stated, in sum

---

[3] Because GARCIA DIAZ is identified as "CC-1" and CC-2 is identified as "CC-2" in the complaint against ALI in *United States v. Ali*, 25 Mag. 3625 (S.D.N.Y.), CC-2 is identified as "CC-2" here for consistency.

[4] Because it appears that the recording device experienced issues capturing video for parts of the interaction, the audio recording is more probative than the video. I have also learned about the events in this paragraph from my discussions with UC-1 and reviewing law enforcement reports prepared by UC-1.

and substance, that this time, he was looking to purchase "manito" for "three or four keys." Based on my training and experience and my participation in this investigation, I know that "manito" refers to mannitol, which is a common cutting agent used with narcotics, including fentanyl, and that "three or four keys" refers to three or four kilograms of narcotics. UC-1 also stated, in sum and substance, that "they usually use it with the H," which, based on my training and experience, I know would mean that UC-1's drug operation uses mannitol to cut heroin ("the H"). CC-2 told UC-1, in sum and substance, that each gram of mannitol is 40 to 50 cents and that there are approximately 400 grams of mannitol in each bottle. UC-1 also conveyed to GARCIA DIAZ and CC-2 that UC-1 wanted to buy glassine envelopes, which, based on my training and experience, I know is a type of envelope commonly used to package narcotics, including heroin. CC-2 told UC-1, in sum and substance, that the total cost for half a box of glassine envelopes and two bottles of mannitol was $360. CC-2 then exited the Store, entered the Shed, exited the Shed carrying a weighted black plastic bag, and re-entered the Store with the bag. CC-2 placed the bag on top of a counter inside the Store and UC-1 observed several brown boxes and two bottles of mannitol inside the bag. UC-1 then handed $360 in cash to a Store employee and left the Store with the bag. Law enforcement later found that the weighted black plastic bag contained two bottles of mannitol and several brown boxes containing glassine envelopes.

       iii.      On or about January 21, 2025, UC-1 entered the Store, spoke with GARCIA DIAZ, and asked to purchase two bags of "manito." GARCIA DIAZ then exited the Store, walked toward the Shed, exited the Shed, and re-entered the Store carrying a weighted black plastic bag. Once inside the Store, GARCIA DIAZ handed UC-1 the bag and UC-1 paid GARCIA DIAZ and left the Store. Law enforcement later found that the weighted black plastic bag contained two bags of mannitol.

       iv.      On or about February 12, 2025, UC-1 again entered the Store when GARCIA DIAZ and CC-2 were inside, and UC-1 asked CC-2 for "manito." CC-2 then exited the Store, entered the Shed, exited the Shed carrying a weighted black plastic bag, and re-entered the Store with the bag. Once inside the Store, CC-2 gave the bag to UC-1, UC-1 paid CC-2, and left the Store. Law enforcement later found that the weighted black plastic bag contained a bag of mannitol.

       v.      On or about July 22, 2025, CS-1 entered the Store and spoke to someone who appeared to be a Store employee and ALI,[5] which was captured in an audio recording created by CS-1.[6] CS-1 greeted the Store employee and asked about making a purchase, and the Store employee told CS-1 to speak to ALI. CS-1 then told ALI that he wanted to purchase "manito," and ALI agreed to sell CS-1 cutting agents. ALI also offered to sell CS-1 morphine, which CS-1 agreed to buy. ALI then exited the Store, entered the Shed, exited the Shed with a weighted black plastic bag, and re-entered the Store with the bag. Below is a still image from surveillance videos showing ALI leaving the Shed and returning to the Store, carrying a weighted black plastic bag:

---

[5] On the same day, following CS-1's visit to the Store, law enforcement showed CS-1 a Department of Motor Vehicles photograph of ALI and CS-1 confirmed that the person CS-1 communicated with inside the Store had the same appearance as ALI.

[6] The audio is of relatively low quality, but I have also learned about the events in this paragraph from my discussions with CS-1 and reviewing law enforcement reports prepared by CS-1.



ALI then handed the bag to CS-1, and CS-1 paid ALI and left the Store with the bag. Inside the weighted black plastic bag, law enforcement found two bags of mannitol and a small plastic bag of a white powdery substance, which subsequently tested positive for procaine in laboratory testing and weighed approximately 13.6 grams. Below is a photograph of the two bags of mannitol and the bag of procaine found inside the bag:



      b.      On at least one occasion, GARCIA DIAZ told UC-1 that he and other Store employees believed that the Store was being surveilled by law enforcement and that Store

employees would not be able to sell cutting agents to UC-1 while the Store was under surveillance. Specifically, on or about January 16, 2025, law enforcement officers observed CC-2 exit a vehicle and stare closely at an unmarked law enforcement vehicle before entering the Store. Shortly thereafter, UC-1 entered the Store and asked GARCIA DIAZ if he could purchase a bottle of mannitol. GARCIA DIAZ told UC-1, in sum and substance, that GARCIA DIAZ's "boss" just called and told him to "shut everything down" because the police were outside the Store. GARCIA DIAZ also told UC-1, in sum and substance, that the police were watching the Store and that if he were to sell UC-1 mannitol, UC-1 could potentially be stopped by police and taken to jail shortly after leaving the Store. GARCIA DIAZ told UC-1, in sum and substance, that the best times to come to the Store to make a purchase was in the early morning hours or the late evening hours and that Sundays are the best day to come to the Store to purchase mannitol. Following this conversation, UC-1 attempted to leave the Store but GARCIA DIAZ told UC-1, in sum and substance, to take a soda from the Store so it would appear as if UC-1 purchased an item from the Store. UC-1 then took a soda from the Store and left the location.

        7.     Based on my personal observations and my participation in this investigation, my conversations with other law enforcement officers, and my review of DEA laboratory reports and surveillance videos, I also learned the following:

        a.     After identifying the Store as a source of cutting agents and drug paraphernalia, like glassine envelopes, law enforcement conducted surveillance on numerous individuals who appeared to have purchased such items from the Store. Those individuals were then observed going to locations or entering vehicles, which law enforcement officers searched under circumstances described below. At each location, law enforcement found evidence of narcotics being prepared, mixed, stored, and/or packaged, in part using cutting agents and packaging material consistent with those that UC-1 and/or CS-1 obtained from the Store. Inside each vehicle, law enforcement found narcotics and cutting agents.[7] For example:

<u>A Manhattan Narcotics Mill Searched on or about August 14, 2024</u>

        i.     On or about August 14, 2024, law enforcement observed an individual ("Individual-1") enter the Store with a teal bag, after which GARCIA DIAZ retrieved a weighted black plastic bag from the Shed. Individual-1 then left the Store with a black plastic bag sticking out of the teal bag. Law enforcement followed Individual-1 as he walked from the Store to an apartment building in Manhattan and then to the door of a particular apartment unit in the building ("Mill-1").

        ii.     After detecting the presence of law enforcement, Individual-1 fled from the location and another unidentified individual climbed out of Mill-1's window, jumped from Mill-1's fire escape, and also fled. A third individual, later identified as Alexis Antonio Diaz, also climbed out of Mill-1's window in an attempt to escape, but he subsequently surrendered to law enforcement and was placed under arrest.

---

[7] Based on my participation in this investigation and my discussions with other law enforcement officers, I know that each time law enforcement followed individuals who had obtained a weighted black plastic bag retrieved from the Shed and conducted a search of that bag, a person, a location, or a vehicle, law enforcement ultimately found evidence of drug trafficking, including cutting agents, drug paraphernalia, and/or narcotics.

iii.        On the same day, law enforcement obtained and executed a judicially authorized warrant to search Mill-1, where they recovered large quantities of narcotics, including over 400 grams of fentanyl mixtures packaged for distribution and over 50 grams of crystal methamphetamine. Laboratory testing revealed that certain of the fentanyl recovered from Mill-1 contained narcotics cutting agents. Law enforcement also found inside Mill-1 equipment and materials used to mix, process, and package narcotics including multiple bottles of mannitol (that is, one of the kinds of cutting agents that UC-1 has purchased from the Store), a hydraulic kilogram press used to press powder narcotics into kilogram-weight bricks, scales used for weighing narcotics, sifters and grinders used to mix narcotics, glassine envelopes used to package narcotics, and stamps used to mark narcotics with logos for branding purposes. Based on my participation in this investigation, I know that the label on the bottles of mannitol found in Mill-1 appear to match the labels on bags of mannitol that UC-1 and CS-1 purchased at the Store, as described above.

iv.        Below are photographs of certain of the packaged fentanyl mixtures (top) and certain of the bottles of mannitol (bottom) found in Mill-1:





8

v.   Data from Diaz's phone obtained pursuant to a judicially authorized warrant revealed that Diaz owned and operated a narcotics mill inside Mill-1 and conspired with others to distribute at least multiple additional kilograms of fentanyl, including fentanyl mixtures containing cutting agents.  Below are still images from a video from Diaz's phone depicting narcotics in the process of being mixed and packaged inside Mill-1:

  

Below are still images from a video from Diaz's phone depicting what appears to be more than a thousand bricks of packaged fentanyl mixtures inside Mill-1:

 

9

vi.        On or about August 15, 2024, Diaz was charged with narcotics distribution and conspiracy to commit the same.  On or about March 20, 2025, he was convicted at trial of these charges.  *See United States v. Diaz*, 25 Cr. 515 (JSR) (S.D.N.Y.).

### A Bronx Narcotics Mill Searched on August 27, 2024

vii.        On or about August 27, 2024, law enforcement observed an individual ("Individual-2") arrive to the vicinity of the Store in a vehicle and park in front of the Store.  Individual-2 exited the vehicle, entered the Store, and left the Store carrying two weighted black plastic bags that appeared to contain cardboard boxes.  Individual-2 then took the bags into the vehicle and drove away from location.

viii.        Law enforcement followed the vehicle to an apartment building in the Bronx and observed an individual later identified as Jose Frias-Herrera and an unidentified person retrieve the two weighted black plastic bags containing cardboard boxes from the vehicle and enter the building with the bags.  Law enforcement then entered the building and observed an individual later identified as Jose Luis Infante-Sanquintin open the door to a particular apartment unit ("Mill-2").  When Mill-2's door was open, law enforcement was able to see inside Mill-2 and observed what appeared to be narcotics and narcotics packaging material inside Mill-2.  Law enforcement officers also saw Frias-Herrera and an individual later identified as Juan Carlos Paula-Martinez inside Mill-2.

ix.        On the same day, law enforcement obtained and executed a judicially authorized warrant to search Mill-2, where they recovered approximately 22 grams of narcotics consisting of fentanyl and heroin.  Below are photographs of certain of the narcotics recovered from Mill-2:

  

x.        Law enforcement also found inside Mill-2 equipment and materials used to mix, process, and package narcotics including several blenders, a scale, cutting tools, stamps, ink pads, and glassine envelopes.  Inside one of Mill-2's rooms, there was what appeared to be a station for stamping and packaging narcotics, which contained a glass slab consistent with what would commonly be used for mixing and cutting narcotics, as well as blenders, sifters,

numerous boxes of glassine envelopes, stamps bearing specific logos, an ink pad, and numerous rubber bands. Below is a photograph of this station:



   xi.  Law enforcement also found inside Mill-2 two weighted black plastic bags containing cardboard boxes that were similar in appearance to the ones Individual-2 got from the Store. Inside the cardboard boxes, law enforcement found tens of thousands of glassine envelopes. Below is a photograph of one of the cardboard boxes, containing smaller boxes of glassine envelopes:



xii.        On the same day, Frias-Herrera, Infante-Sanquintin, and Paula-Martinez were arrested, and they were subsequently charged with narcotics offenses. *People v. Paula-Martinez, et. al.*, IND-74542-24/006 (N.Y. Cty. Crim. Ct.).

<u>A Bronx Narcotics Mill Searched on September 11, 2024</u>

xiii.        On or about September 11, 2024, law enforcement observed an individual later identified as Engels Taveras drive a vehicle to the Store and enter the Store. Law enforcement then observed a Store employee exit the store, enter the Shed, exit the Shed carrying a weighted black plastic bag, and re-enter the Store with that bag. Taveras then left the Store with what appeared to be the bag that the Store employee had retrieved from the Shed.

xiv.        Taveras left the vicinity of the Store in a vehicle and law enforcement followed him to another location where Taveras pulled over and an unidentified individual handed him a weighted white plastic bag through one of his car windows. Law enforcement then followed Taveras back to an apartment building in the Bronx and observed Taveras enter the building, carrying the weighted black and white plastic bags.

xv.        That same day, law enforcement identified a particular apartment unit ("Mill-3") in the building that Taveras had entered. They obtained and executed a judicially authorized warrant to search Mill-3, where they recovered large amounts of narcotics, including over 1.3 kilograms of fentanyl in both pressed kilogram-brick form and as individually packaged fentanyl mixtures, ready for street-level distribution. Laboratory testing revealed that certain of the fentanyl recovered from Mill-3 contained narcotics cutting agents. Law enforcement also found inside Mill-3 equipment and materials used to mix, process, and package narcotics, including a bag of quinine HCl (which, based on my training and experience, I know is a common narcotics cutting agent), a manual kilogram press used to press powder narcotics into kilogram-weight bricks, scales, sifters, grinders, and glassine envelopes. Below are photographs of certain of the packaged fentanyl mixtures (left) and a brick of pressed fentanyl powder with "Bugatti" imprinted on it (right):

 

Below is a photograph of certain of the narcotics cutting agents found inside Mill-3:



      xvi.      The same day, Taveras was arrested, and he was later charged with narcotics distribution and conspiracy to commit the same. *See United States. v. Taveras*, 25 Cr. 10 (RMB) (S.D.N.Y.).

<u>A Bronx Narcotics Mill Searched on September 16, 2024</u>

      xvii.      On or about September 16, 2024, law enforcement observed an individual later identified as Ruddy Ovalle enter the Store. Shortly thereafter, law enforcement observed a Store employee exit the Store, enter the Shed, exit the Shed with a weighted black plastic bag, and re-enter the Store with that bag. Before the Store employee re-entered the Store, another individual ("Individual-3") entered the Store. After the Store employee re-entered the Store, Ovalle left the Store carrying a weighted black plastic bag similar in appearance to the bag the Store employee retrieved from the Shed, and Individual-3 left the Store carrying a different large bag. Ovalle and Individual-3 took the bags into a vehicle and drove away from the location.

      xviii.      Law enforcement followed the vehicle back to an apartment building in the Bronx and observed Ovalle exit the vehicle and enter the building carrying the weighted black plastic bag, while Individal-3 remained in the vehicle. Law enforcement then identified a particular apartment unit ("Mill-4") in the building associated with Ovalle, approached the apartment unit, and heard sounds coming from inside consistent with the sounds of someone activating a blender and cutting on a glass surface. Law enforcement then saw Ovalle exit Mill-4 carrying a weighted bag. Shortly thereafter, Ovalle was placed under arrest, and inside the weighted bag, law enforcement found approximately one kilogram of cocaine.

      xix.      The same day, Ovalle consented to a search of Mill-4, which law enforcement then searched. Law enforcement found in Mill-4 materials and equipment used to mix, process, and package narcotics, including sifters, razors, gloves, sandwich bags, and plastic

bags containing white powdery substances. Below is a photograph of certain of the materials and equipment used to mix, process, and package narcotics found inside one of Mill-4:



xx.     That same day, Ovalle was arrested and he was later charged with narcotics distribution and conspiracy to commit the same. *See United States v. Ovalle*, 24 Mag. 3358 (UA) (S.D.N.Y.).

<u>A New Jersey Narcotics Mill Searched on October 16, 2024</u>

xxi.     On or about August 13, 2024, after UC-1's visit to the Store as described above in Paragraph 5, law enforcement observed GARCIA DIAZ exit the Store, enter the Shed, exit the Shed carrying a weighted black plastic bag, and re-enter the Store with that bag. Law enforcement then observed an individual ("Individual-4") carry what appeared to be the same bag into a vehicle and leave the location by car. Law enforcement then followed Individual-4 to a location in Paterson, New Jersey.

xxii.     On or about October 16, 2024, law enforcement observed Individual-4 at a residential apartment building in Paterson, New Jersey. Surveillance videos from the building show Individual-4 walking toward a particular apartment unit in the building ("Mill-5"). Individual-4 then left the location and returned to the lobby of the apartment building that same day. Individual-4 appeared to notice law enforcement officers who were not in uniform and repeatedly looked out the window at the officers. Law enforcement then entered Mill-5 to secure the location.

xxiii.     Individual-4 consented to a search of Mill-5, where law enforcement recovered large amounts of narcotics, including bags of stamped glassine envelopes containing white powder and yellow powder, which subsequently tested positive for fentanyl. Law enforcement also found equipment and materials used to mix, process, and package narcotics, including grinders, sifters, stamped glassine envelopes, rubber bands, stamps, a scale, a mask, and a kilogram press. Below are photographs of certain of the fentanyl packaged in stamped glassine envelopes found in Mill-5:



<u>Narcotics Traffickers Identified on February 12, 2025</u>

xxiv.        On or about February 12, 2025, law enforcement observed two individuals ("Individual-5" and "Individual-6") arrive to the vicinity of the Store in a truck, exit the truck, and enter the Store. Law enforcement later learned that a third person ("Individual-7") was also inside the truck and remained inside the vehicle as Individual-5 and Individual-6 entered the Store. After Individual-5 and Individual-6 entered the Store, a Store employee then exited the Store, entered the Shed, exited the Shed, and re-entered the Store. Individual-5 and Individual-6 then left the Store with a weighted black plastic bag, entered the truck with the bag, and left the location.

xxv.        Law enforcement followed the truck and observed it stop at a location in Manhattan. Law enforcement then observed another car pull over and park directly in front of the truck. Individual-5 left the truck empty handed, entered the other car, then got back out of the car carrying a weighted white bag. Individual-5 then handed the bag to someone seated in the truck. Law enforcement approached the truck and conducted a vehicle search. As part of the vehicle search, law enforcement recovered one vacuum sealed bag of a crystal-like substance, two bags of loose white powder, and one blue plastic bag of pressed white powder. Laboratory testing showed that the substances contained in the bags included approximately 199 grams of cocaine and approximately 443 grams of methamphetamine. Additionally, one of the bags tested positive for phenacetin, which, based on my training and experience, is a drug commonly used in pain and fever relief and is often used as a narcotics cutting agent, including for cocaine. Below is a photograph of the bags of narcotics and cutting agents found inside the truck:



A Bronx Narcotics Mill Searched on August 11, 2025

        xxvi.      On or about August 11, 2025, law enforcement observed an individual later identified as Carlos Gagot exit a vehicle and enter the Store. Shortly thereafter, a Store employee left the Store, entered the Shed, exited the Shed carrying a weighted black plastic bag, and re-entered the Store with that bag. Gagot then left the Store, entered a vehicle, and rode away in the vehicle.[8]

        xxvii.     Law enforcement followed Gagot in the vehicle back to an apartment complex in the Bronx and observed Gagot exit the vehicle, carrying a weighted black plastic bag similar in appearance to the bag the Store employe retrieved from the Shed, and enter the complex. Law enforcement followed Gagot on foot to the floor of an apartment building on which a particular apartment unit ("Mill-6") is located. A few hours later, law enforcement observed Gagot leaving the building, carrying a weighted shopping bag and entering a vehicle with that bag. Law enforcement stopped the vehicle and in a subsequent search of the vehicle, law enforcement found inside the bag two kilogram-bricks of cocaine. Below is a photograph of the two bricks of cocaine:

---

[8] Law enforcement was not positioned such that they were able to observe what, if anything, Gagot was holding when he exited the Store and re-entered the vehicle.

16



      xxviii. On the same day, law enforcement determined that an individual identified as David Reyes resided at Mill-6 and observed Reyes leave Mill-6's building shortly after Gagot had left the building carrying the bag containing cocaine. Both Gagot and Reyes were arrested.

      xxix. Also on the same day, law enforcement obtained and executed a judicially authorized warrant to search Mill-6, where they recovered large quantities of narcotics, including over 861 grams of methamphetamine pills, a brick of pressed fentanyl powder that weighed over one kilogram, and over 955 grams of cocaine. The aforementioned narcotics were found inside a concealed compartment (the "Trap") built into a coffee table in Mill-6's living room. Inside the Trap, law enforcement officers also recovered three loaded firearms, magazines, and a box and bag of ammunition. Additionally, law enforcement officers found inside the Trap digital scales that I know, based on my training and experience, are often used for weighing narcotics. Below are photographs of certain of the cocaine and fentanyl found in the Trap:



Below is a photograph of the methamphetamine pills found in the Trap:



Below is a photograph of the narcotics, three firearms, and ammunition found in the Trap, which are shown in the photograph on top of the coffee table containing the Trap:



xxx.    Law enforcement officers searching other locations in Mill-6 found additional materials and equipment used to mix and press narcotics, including a blender, which is often used for mixing narcotics, that contained residue consistent with the appearance of narcotics residue and a hydraulic kilogram press. Law enforcement also found metal plates bearing a Rolex logo and a Nike logo, which are commonly used with a kilogram press to create impressions in bricks of pressed narcotics powder for branding purposes.

xxxi.    Data from Reyes's phone obtained pursuant to a judicially authorized warrant revealed that Reyes conspired with others to distribute large quantities of additional narcotics, including pills that appear similar in appearance to the methamphetamine pills seized from Mill-6 and multiple additional kilograms of pressed narcotics powder. Below is a still image from Reyes's phone depicting envelopes of narcotics, one of which is cut open to reveal narcotics powder inside (left), a photograph from Reyes's phone depicting multiple kilogram-sized bricks of apparent narcotics (center), and a screenshot from Reyes's phone showing someone sending Reyes numerous methamphetamine pills (right):

  

xxxii.    On or about August 12, 2025, Reyes and Gagot were charged with narcotics distribution and conspiracy to commit the same; Reyes was also charged with possessing firearms in furtherance of a drug trafficking crime. *See United States v. Reyes and Gagot*, 25 Cr. 502 (DLC) (S.D.N.Y.).

<u>Narcotics Trafficker Identified on October 15, 2025</u>

xxxiii.    On or about October 15, 2025, law enforcement observed an individual ("Individual-8") drive a vehicle to the Store and enter the Store. Shortly thereafter, law enforcement observed GARCIA DIAZ exit the Store, enter the Shed, exit the Shed carrying a weighted black plastic bag, and return to the Store from the Shed with that bag. Individual-8 then exited the Store carrying a bag similar in appearance to the weighted black plastic bag that GARCIA DIAZ retrieved from the Shed, entered the vehicle with the bag, and drove away from the location.

xxxiv.    Law enforcement followed Individual-8 in the vehicle as Individual-8 visited multiple locations in Bronxville and Mount Vernon, New York, including a parking garage in Mount Vernon. At the parking garage, law enforcement observed Individual-8 drive to the top floor, enter the backseat of a different vehicle (the "Subject Vehicle") that was parked on that floor, leave the Subject Vehicle shortly thereafter, and drive away from the location in the vehicle that Individual-8 had used to get there. Later that day, law enforcement stopped Individual-8 and placed Individual-8 under arrest. Individual-8 consented to a search of the Subject Vehicle, which law enforcement searched that day. Inside the Subject Vehicle, law enforcement found a black plastic bag that was similar in appearance to the bag retrieved from the Shed, which contained a smaller clear bag of phenacetin and approximately 154 grams cocaine. Inside the vehicle, law enforcement also found an empty magazine for a firearm.

8.    Based on my participation in this investigation and my discussions with other law enforcement officers, I know, among other things, the following:

a.    On or about November 17, 2025, law enforcement placed QUIRINO GARCIA DIAZ, the defendant, and MUJAHED ALI under arrest. On the same day, law enforcement executed a judicially authorized warrant to search the Store and the Shed. In the Store and the Shed, law enforcement recovered large volumes of suspected cutting agents, bulk quantities of various drug paraphernalia, and equipment used for mixing and pressing narcotics.

b.    Specifically, inside the Store, law enforcement found stamps used for stamping logos onto narcotics packaging, glassine envelopes, and grinders. Behind the Store's counter, law enforcement also found a set of keys that law enforcement later determined unlocked a storage unit inside the Shed.

c.    When executing the search of the Shed, law enforcement found that the entrance to the Shed led to a basement area that had a hallway that led to a locked door. Law enforcement used the keys found inside the Store to unlock the door and found that the door opened into a two-room storage space. Inside the storage space, law enforcement found what appeared to be hundreds of thousands of glassine envelopes, tens of thousands of small vials that are commonly used to hold narcotics including cocaine and crack cocaine, tens of thousands of small plastic bags that are commonly used to hold an individual dose of narcotics, and numerous black plastic bags similar in appearance to the bags that carried cutting agents that were sold to UC-1 and CS-1. Inside the storage space, law enforcement also found three devices intended to press powder narcotics into kilogram bricks, commonly known as a "kilo press," approximately a dozen sifters, multiple scales, and multiple grinders with powder residue inside. Below are still images from a video depicting the part of the storage space that contained the aforementioned drug paraphernalia and equipment:



d.    Inside the storage space, law enforcement found a room that was filled with numerous bags and bottles of suspected cutting agents, much of which was in powder form. Certain of the bottles were labeled as containing procaine and lidocaine. Below are a still image from a video (right) and a photograph (left) depicting certain of the suspected cutting agents found in the storage space:

 

e.    Following GARCIA DIAZ's arrest, law enforcement provided GARCIA DIAZ *Miranda* warnings; GARCIA DIAZ waived his *Miranda* rights and participated in an interview with law enforcement. GARCIA DIAZ stated, in sum and substance, that he had worked at the Store for approximately one year or a year and a half and that CC-2 gave him instructions on how to retrieve cutting agents from the storage space in the Shed, including weighing and packaging the cutting agents. GARCIA DIAZ also stated, in sum and substance, that, for a period, CC-2 was the person who paid GARCIA DIAZ but that someone else pays GARCIA DIAZ now. Although GARCIA DIAZ initially denied knowing that what was sold from the Store was used for drugs, he later stated, in sum and substance, that he believed that the "paper envelopes" and the "plastic envelopes"—which I believe refer to glassine envelopes—were used for drugs and that "manito" was used for drugs.

WHEREFORE, I respectfully request that QUIRINO GARCIA DIAZ, the defendant, be imprisoned or bailed, as the case may be.

Alex Johnson
Special Agent
Drug Enforcement Administration

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 14 day of November, 2025

THE HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York